Hendrick Ranch Royalties v. Commissioner.
Hendrick Ranch Royalties v. Commissioner
Docket No. 104008.
United States Tax Court
1943 Tax Ct. Memo LEXIS 394; 1 T.C.M. (CCH) 794; T.C.M. (RIA) 43137; March 22, 1943
*394 R. B. Cannon, Esq., 911 Sinclair Bldg., Fort Worth, Tex., and Benj. L. Bird, Esq., for the petitioner. Stanley B. Anderson, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the years 1935, 1936, and 1937, in the respective amounts of $859.86, $1,223.70, and $2,134.32, and a deficiency of $302.15 excess profits tax for the year 1935. For the year 1936, respondent added a 25 percent penalty in the amount of $305.93 under section 291 of the Revenue Act of 1936 for failure to file the return within the time prescribed by law. Petitioner claims that it is entitled to refund of taxes paid for the year 1935. The issues involve questions of whether petitioner sustained losses in each of the taxable years resulting from the misappropriation of its income by its officers for the use of another corporation, and whether petitioner is entitled to certain deductions for various expenditures, whether petitioner is taxable on gain in 1935 from the sale of a lease, and whether the penalty was properly imposed for the late filing of the return for 1936. Petitioner filed its returns for 1935 and 1936 with *395 the internal revenue collector for the district of Oklahoma, and, for 1937 with the collector for the second district of Texas. Findings of Fact (1) Petitioner, a Texas corporation, had its principal place of business in Tulsa, Oklahoma, during 1935 and 1936, and in Dallas, Texas, during 1937. Petitioner kept its books and filed its returns on the accrual basis. Petitioner owned royalty interests in valuable oil producing properties from 1930 through the taxable years. Its income was derived from the sale of oil runs to various pipe-line companies. Other property owned by petitioner included undeveloped oil properties. Sneed Royalty Company, a Delaware corporation, with its principal office in Tulsa, Oklahoma, was engaged in the business of purchasing and reselling oil royalties during the years prior to 1930 and thereafter. Sneed Royalty Company, hereinafter referred to as Sneed Royalty, as affiliated, by stock ownership, with Sneed Petroleum Corporation and Y Oil & Gas Company. Earl Sneed and Dale Sneed were directors and officers of Sneed Royalty. Earl Sneed was president; Dale Sneed was vice president, and E. E. Tate was secretary. On February 27, 1930 Sneed Royalty acquired *396 44,432 shares of the capital stock of petitioner. At that time the authorized capital stock of petitioner was 60,000 shares of no-par value stock. Through the acquisition of petitioner's stock on the above date, Sneed Royalty owned a majority of petitioner's outstanding stock. Earl Sneed became the president of petitioner and Dale Sneed, vice president. They were also directors. E. E. Tate became secretary and L. D. Edgington became treasurer. After February 27, 1930, the management of petitioner and Sneed Royalty were the same, and Earl Sneed and Dale Sneed controlled petitioner's affairs. From February, 1930, until October 26, 1935, petitioner's officers conducted the management of petitioner with total disregard of the separate corporate entity of petitioner. In fact, Sneed Royalty and petitioner were operated under a single personal management with identical or interlocking board of directors and identical officers. The two corporations were operated as one corporate entity, notwithstanding that the stock ownership of the two corporations was altogether different. During the above period the business of the two corporations was intermingled; the names of the corporations were *397 wrongfully endorsed upon the obligations of the other; the separate accounts of the two corporations for services, rents, and supplies were merged into one single account; charges for various expenses of both corporations were made against a joint account; the proceeds of oil runs on the properties of petitioner were applied to the payment of notes and accounts of Sneed Royalty, and the management of the two corporations caused petitioner to execute and deliver mortgages on all of its separate properties to secure indebtedness not its own, but indebtedness of Sneed Royalty and of other companies operated as affiliates of Sneed Royalty. The books and records of Sneed Royalty and petitioner were handled as if the two corporations were one consolidated corporation, and the books were kept in such a way that it was extremely difficult to determine the separate transactions and interests of the two corporations. In many respects the officers of the two corporations failed to observe the integrity which their duties as officers of separate corporations required, as a matter of law. A commingling and intermingling of the affairs of the two corporations was accomplished, largely, through *398 running accounts between petitioner and Sneed Royalty and petitioner and Y Oil & Gas Company. The inter-company running accounts were used to draw off petitioner's current income by direct payment of cash to the other companies, chiefly to Sneed Royalty, and by petitioner's payment of current expenses of the other two companies. The other companies did not make cash reimbursements to petitioner. Sneed Royalty made sales of unproductive properties to petitioner at inflated values and obtained in payment, petitioner's notes secured by mortgages on all of its valuable producing properties together with assignments of petitioner's interests in royalties and oil runs. Sneed Royalty then pledged such interests in petitioner's properties and income with banks to secure its own separate indebtedness. From April 18, 1931, until April 2, 1937, all of petitioner's income from its interests and royalties was assigned to Sneed Royalty and was received by it, directly or indirectly. During the period from October 26, 1935, to April 2, 1937, the Sneeds did not control petitioner. New officers and directors were elected on October 26, 1935. However, the new officers and directors were unable to *399 obtain any of the income of petitioner derived from its royalty interests. Only as a result of litigation and a final order of the United States District Court for the Northern District of Texas, which was entered on April 2, 1937, was the recovery of petitioner's income obtained. It was not until after April 2, 1937, that petitioner actually received any income from its properties. When, in 1937, petitioner's properties were released from liens and its income was released from assignments, petitioner did not recover any of its income which had been diverted to the use of Sneed Royalty and other corporations and to the individual officers of Sneed Royalty during the period from February 27, 1930, to April 2, 1937, because Sneed Royalty had been declared bankrupt and petitioner's attorneys were unable to locate any assets. The material inter-company transactions and the facts relating to extensive litigation involving petitioner are as follows: (a) On February 27, 1930, Sneed Royalty acquired 44,432 shares of petitioner's capital stock for a stated consideration of $332,000, payable $25,000 in cash, $110,000 in 8 percent preferred stock of Sneed Royalty and $197,000 evidenced by a *400 note of Sneed Royalty made payable to E. E. Fogelson. Sneed Royalty borrowed $17,900 from petitioner which amount was charged to an open account of Sneed Royalty on petitioner's books. Sneed Royalty applied the $17,900 to the cash payment for the stock, so that, in fact, Sneed Royalty paid only $7,100 in cash for petitioner's stock out of its own separate cash. Simultaneously with the acquisition of the above stock the incumbent officers and directors resigned and Earl Sneed and Dale Sneed were elected as officers and directors so that the first act of the new officers was to withdraw funds from petitioner. (b) During 1930 petitioner made cash advances to Sneed Royalty in the amount of approximately $90,266.38. As of October 30, 1930, Sneed Royalty owed petitioner approximately $108,166.38. (c) On October 30, 1930, petitioner's directors adopted a resolution authorizing petitioner to purchase from Sneed Royalty various oil royalties on Texas properties for a consideration of $106,824.79. At that time Sneed Royalty was indebted to the Fourth National Bank of Tulsa, Oklahoma, for $25,000. Petitioner was to pay for the above properties, monthly, out of oil runs from petitioner's original *401 productive properties and by assuming the obligation of Sneed Royalty to the Fourth National Bank. The open account of Sneed Royalty on petitioner's books was credited with $41,952.05 in September, 1930, $50,667.50 in October, 1930, and $14,205.54 in October of 1930, total $106,825.09. (d) During the latter part of 1930, petitioner made application to the secretary of state of the State of Texas for authorization to increase its capital stock from 60,000 shares to 90,000 shares. Petitioner certified that 10 percent of the increased capital stock had been subscribed and paid for and that Dale Sneed had subscribed for 6,656 shares for a total consideration of $33,283.20. The consideration for this stock was paid by an alleged transfer of oil royalties for a stated value of $33,283.20 on October 31, 1930. All of the oil royalties transferred under this alleged sale were included in the oil royalties which Sneed Royalty sold to petitioner on October 30, 1930. The alleged transfer of October 31, 1930, was never recorded. No consideration was ever received by petitioner for the 6,656 shares of new stock issued to Dale Sneed. (e) On February 27, 1931, petitioner owed Sneed Royalty $19,673.22 *402 on the properties purchased on October 30, 1930. On the same date, Sneed Royalty offered to sell some additional royalties to petitioner in exchange for stock. At a special meeting of the directors held on February 27, 1931, a resolution was adopted authorizing petitioner to purchase the additional royalties from Sneed Royalty and to issue 6,700 shares of its capital stock in full payment for the properties and the balance due, as stated above. (f) Sometime prior to February 27, 1931, petitioner's officers submitted an offer to Y Oil & Gas Company to sell certain royalties to it for a consideration of $87,197.78. At the meeting of petitioner's directors held on February 27, 1931, the acceptance of petitioner's offer was presented. Petitioner's directors authorized the sale of the royalties to the Y Oil & Gas Company. All of the royalties covered by this transaction were included in the royalties which Sneed Royalty sold to petitioner as of February 27, 1931. (g) After the transaction of February 27, 1931, the Sneed Royalty account on petitioner's books was in balance. [1]
*403 (h) On April 18, 1931, petitioner's directors authorized the purchase from Sneed Royalty of additional interests in oil royalties or oil producing properties in Oklahoma, Kansas, and Texas for a stated consideration of $142,537.87, that is, petitioner was authorized to purchase the interests in Kansas properties for $31,001 in the Oklahoma properties for $20,250, and in the Texas properties for $91,286.87. Petitioner executed and delivered to Sneed Royalty three notes bearing 8 per cent interest in the respective amounts of $31,001, $20,250, and $91,286.87. To secure these notes, petitioner gave Sneed Royalty mortgages covering all of the properties purchased, mortgages on other properties owned by petitioner, and assignments of oil and gas runs from all of petitioner's producing properties. Petitioner directed the Southern Pipe Line Company of Ft. Worth, Texas, and the Humble Oil & Refining Company of Houston, to deliver all checks from oil runs to the Exchange National Bank of Tulsa, until the assignment should be released. An entry was made in the open account with Sneed Royalty in petitioner's books to show the indebtedness of petitioner to Sneed Royalty in the amount of $142,537.87. *404 All of the above properties were non-productive properties. At the time of the sale, there was a wide-spread depression in the oil industry in the locality. West Texas crude oil had dropped to 30-cents a barrel from a price of 89-cents in 1930. Trading in oil properties had become inactive. A fair price for the above properties on April 18, 1931, was as follows: $10,432 for the Texas properties; $5,000 for the Oklahoma properties; and $7,500 for the Kansas properties; total, $22,932. From April 18, 1931, to April 2, 1937, petitioner's income was applied in the payment of interest on the above notes in the following amounts: $12,400 for 1932; $10,788.48 for 1933; and $9,225 for 1934; total, $32,413.48. Also, petitioner's income was applied to reduce the principal amount of the notes in the amount of $45,264. On March 31, 1937, the unpaid balance of the above notes was $97,273.87. (i) During 1935, petitioner sold certain undeveloped royalties for a consideration of $5,500. Petitioner's account with Y Gas & Oil Company was credited with the entire amount. (j) On April 6, 1935, petitioner borrowed from the First National Bank & Trust Company of Tulsa, Oklahoma, $24,121.02. Petitioner *405 made various disbursements out of the proceeds of this loan to the Y Oil & Gas Company, aggregating $14,351.89. Also, out of the proceeds of this loan, Earl Sneed was paid $7,343.35; franchise taxes were paid to the State of Texas in the amount of $1,524.53. The total of the above disbursements was $23,219.77. (k) Petitioner's return for 1935 reported gross receipts from royalties in the amount of $21,399.16, and receipts from lease revenues of $3,323, total, $24,722.16. As of January 1, 1935, petitioner's books showed accounts receivable of $4,138.77. During 1935 petitioner's income was disbursed in the following way: payments to the Fourth National Bank of Tulsa, under assignments, $17,999.23, and, in addition, $461.85, total, $18,461.48. Sneed Royalty received the amount of $4,399.98. The running account with Sneed Royalty on petitioner's books was credited with the total amount of $22,861.46. Also, Y Oil & Gas Company received $2,254.45. (1) According to petitioner's books, its gross income for 1936 was $24,408.02 which comprised revenues from royalties in the amount of $20,311.27 and lease revenues in the amount of $4,096.75. Petitioner's income was paid and used as follows: *406 The Fourth National Bank of Tulsa received $13,719.87; Earl Sneed received $1,550 for salary due him by Sneed Royalty, but paid by petitioner and credited to the running account with Sneed Royalty; $1,830.73 was deposited in a bank account of Sneed Royalty and credited to the running account with Sneed Royalty; miscellaneous expenses of Sneed Royalty were paid in the amount of $257.06 and the account with Sneed Royalty was credited in that amount; total $17,357.66. (m) During 1937, the running account with Sneed Royalty was credited with $2,418.04 which represented a disbursement out of petitioner's income for 1937. (n) On or about January 25, 1935, petitioner's note for $91,286.87, which petitioner had given to Sneed Royalty in part payment for the royalties purchased on April 18, 1931, was assigned by Sneed Royalty to the Fourth National Bank of Tulsa, together with the deed of trust on petitioner's properties secured in payment of the note. Sneed Royalty assigned the note to the Fourth National Bank to secure its own indebtedness. The due date of the note had been extended to May 1, 1936. (2) During the year 1935, petitioner sold an oil lease known as the Griffin-Davis lease *407 to L. L. Sugar for a total consideration of $45,000. Petitioner and the Y Oil & Gas Company each owned a one-half interest in this lease. In payment, Sugar gave petitioner his note for $45,000. Petitioner's account with Y Oil & Gas Company was credited with $22,500, one-half of the purchase price. (3) In the latter part of 1934, 30,000 shares of petitioner's stock were transmitted to New York for sale where they came into the hands of George C. Fuller. He was a dealer in blocks of stock. The financial statements of petitioner showed inter-company obligations of approximately $130,000. Retail distributors requested that the inter-company obligations should be eliminated from petitioner's books. The directors of Sneed Royalty and petitioner agreed to eliminate the obligations. However, they failed to carry out the agreement. As a result of this, George C. Fuller went to Tulsa in June of 1935, with an attorney, to make an investigation. Thereafter, he and other stockholders agreed to institute a derivative stockholders suit for petitioner's benefit against petitioner and Earl and Dale Sneed. Fuller instituted an action on behalf of the minority stockholders representing about 20,000 *408 shares of stock. In August of 1935, an action was instituted in the United States District Court for the Northern District of Oklahoma in the name of George C. Fuller et al, against Hendrick Ranch Royalties, Sneed Royalty Company, Sneed Royalty Company, Sneed Petroleum Corporation, Earl Sneed, Dale Sneed, L. D. Edgington, and others. The number of the suit was No. 1067, in Equity. The action sought recovery of petitioner's income, which it also alleged had been wrongfully withdrawn from petitioner's treasury by its officers, and wrongfully devoted to the uses of Sneed Royalty and the individual defendants. The action also sought a complete accounting of all transactions between petitioner and Sneed Royalty and Sneed Petroleum Corporation and their respective officers. It sought removal of the officers of petitioner and the appointment of a temporary receiver. It was alleged that petitioner's officers had embezzled in excess of $15,000 of petitioner's funds; that worthless royalties had been sold by Sneed Royalty and Sneed Petroleum to petitioner in fraudulent transactions for the purpose of securing mortgages on petitioner's property and assignments of its income; and that the mortgages *409 and the assignments had been transferred by Sneed Royalty and Sneed Petroleum to the Fourth National Bank of Tulsa to secure the obligations of those two companies. Coakley & McDermott, a law firm, was engaged by Fuller to institute the above action. The court directed that an audit should be made of the petitioner's books. George C. Fuller employed E. A. Cahill to make a preliminary audit and this audit was delivered to the attorneys for the Sneeds on October 11, 1935. The audits revealed that operations had been carried on by petitioner's officers, the Sneeds, which were not for the best benefit of petitioner and its stockholders. The suit, No. 1067, in Equity, did not go to trial. One day before the trial of the above action Earl Sneed and others offered to resign if their resignations would eliminate the appointment of a receiver. (4) On October 26, 1935, there was a special meeting of petitioner's stockholders which was held in Tulsa, Oklahoma. Earl Sneed and E. E. Tate were present. At the meeting there were submitted the resignations of Robert E. Garrett, Earl Sneed, and Dale Sneed as directors. The following were elected to the board of directors: John Alvin Young, a New *410 York banker, Fred S. Cook and George C. Fuller. Young was elected president; Edgington was elected treasurer; E. E. Tate resigned as secretary, and J. R. Sevall was elected secretary. The newly elected directors appointed the firm of Cahill & Co. to complete the audit of petitioner's books. The firm of Coakley & McDermott of Tulsa was designated as counsel for petitioner. George C. Fuller had been director of petitioner since October 26, 1935, and on November 11, 1936, he was elected president. (5) On November 7, 1935, a meeting of the new directors was held in Tulsa. It was brought to the attention of the directors that certain pleadings had been filed in the action No. 1067, in Equity, by the law firm of Randolph, Haver, Shirk & Bridges, purported to be on behalf of petitioner, and that the appearance of said attorneys was unauthorized by petitioner's directors and that the pleadings were contrary to the intents and purposes of the directors. It was resolved that the above-named law firm should be notified to take no further action on behalf of petitioner and to withdraw its appearance. It was also resolved that all actions of said law firm purported to be on behalf of petitioner *411 were repudiated. It was also resolved that the law firm of Coakley & McDermott should be authorized to defend any and all legal actions filed against petitioner and to associate other counsel with themselves, if necessary. It was also resolved that petitioner should enter its appearance in No. 1067, in Equity, it being the opinion of the directors that the suit had been brought for the benefit of petitioner. It was also resolved to notify all stockholders of petitioner of the changes in the board of directors and of the steps which had been initiated for the rehabilitation of petitioner. (6) During 1935 and 1936 several suits were instituted against petitioner. In November of 1935, three creditors of petitioner filed an involuntary petition in bankruptcy under the Bankruptcy Statute then known as 77-B, in the United States District Court of Fort Worth, Texas, praying for involuntary bankruptcy of petitioner. The three creditors were Mid-Continent Building Company, Hays Co., and Henry Printing Company. Hays Co., auditors, had rendered services to the former management of petitioner and to Sneed Royalty. Mid-Continent Company had made claim for rent and a claim upon a note of Sneed *412 Royalty on which petitioner's name appeared as an accommodation surety. Earl Sneed had decided to rescind his resignation as president of petitioner and he entered an appearance in the above proceeding decourt ruled that he did not represent petitioner. The defense in this case was to keep petitioner out of bankruptcy. The recovery of property was not involved. Coakley & McDermott were counsel for petitioner in its defense in that proceeding. Coakley & McDermott employed the firm of Zweifel & Touhy, in Fort Worth, to assist them in the defense, and the expense incurred in 1936 for their services was $520.85. Early in 1936, the case came on for trial and judgment was given in petitioner's favor dismissing the bankruptcy proceeding. Also, in April of 1936, Earl Sneed and others brought a suit against George C. Fuller and others in the District Court of Tarrant County, Texas, 96th District, to enjoin the holding of a meeting of petitioner's stockholders. The action was founded upon an ex parte restraining order issued without notice by the District Court of Ft. Worth which effectually restrained the holding of the annual meeting of the stockholders. It was not until November of 1936 *413 that petitioner was able to get a hearing in this case which resulted in dissolution of the injunction. Coakley & McDermott represented petitioner's officers. Also, in 1936, a suit was filed in the District Court of Tarrant County, Texas, by the Fourth National Bank of Tulsa, against petitioner, to foreclose upon all of the properties of petitioner under mortgages on petitioner's properties which had been pledged by Sneed Royalty and Sneed Petroleum Corporation to secure their own obligations. This suit also prayed for a receivership of petitioner, as a Texas corporation. Coakley & McDermott defended petitioner in this action. Eventually this suit was dismissed by the plaintiff. Another suit was instituted by Mid-Continent Building Company against petitioner in the District Court of Tulsa County. This suit was removed to a Federal court. The action involved a claim upon notes of Sneed Royalty upon which the name of petitioner appeared as an endorser. A joint office had been maintained by Sneed Royalty, Sneed Petroleum Corporations, and petitioner in a building owned by Mid-Continent. No effort had been made to divide the rents and for some time petitioner had paid the rents. Coakley *414 & McDermott defended petitioner. Another suit was filed in Tulsa County, Texas, by R. M. Hays Co. against petitioner to recover fees for auditing services rendered to petitioner during the incumbency of the Sneeds as officers. Coakley & McDermott defended this suit. (7) In 1936 a suit was filed by petitioner in the Chancery Court in Wilmington, Delaware, against Sneed Royalty. The suit sought the appointment of a receiver and the setting aside of the mortgages and assignments on petitioner's property. Sneed Royalty had lost its charter in Delaware. Petitioner engaged two New York attorneys, Max Chopnick and Stewart Lynch to prosecute this proceeding. This was a suit to sequester the properties of Sneed Royalty so that petitioner could remove liens from its separate property. The expenses incurred in 1936 for the services of these attorneys were $3,500 for Max Chopnick and $65.18 for Stewart Lynch. (8) In the latter part of 1936 Sneed Royalty was adjudged bankrupt and Earl Sneed was appointed its receiver. On or about January 19, 1937, Earl Sneed trustee in bankruptcy of Sneed Royalty, brought an ancillary action in the United States District Court for the Northern Division of Texas *415 against petitioner and the Fourth National Bank of Tulsa. The action was No. 903, in Equity. It was an action attempting to foreclose the lien of Sneed Royalty on petitioner's properties by virtue of the mortgages given by petitioner in the transaction of April 18, 1931. The action also prayed for the appointment of a receiver. Petitioner filed an answer and crossbill alleging that the transaction of 1931 was without consideration and that petitioner's notes and mortgages were void and unenforceable. Petitioner alleged that the transaction had been made through the fraud of Earl Sneed and other individuals with intention to defraud petitioner; that Sneed Royalty had wrongfully received and retained the proceeds of all of the oil runs of petitioner's properties and had thereby withdrawn in excess of $100,000 from petitioner's treasury, for all of which petitioner had received no consideration. The above proceeding did not come to trial. Early in 1937 petitioner worked out a compromise and settlement with Earl Sneed, trustee. On April 2, 1937, the District Court, in No. 903, in Equity, entered its findings of fact and decree. On April 8, 1937, the United States District Court in No. *416 1067, in Equity, entered a decree and findings of fact. These decrees terminated the litigation between petitioner, Earl Sneed, trustee, and the various others who had instituted actions against petitioner, including Mid-Continent Company. (9) Petitioner entered into a settlement with Earl Sneed in No. 903 and No. 1067, in Equity, upon the advice of its counsel, R. B. McDermott, who was unable to discover any assets of Sneed Royalty and had concluded that the petitioner would be unable to recover any money from that bankrupt corporation or its officers. We believed that the most that petitioner could recover was the cancellation of mortgages on its properties and the cancellation of the assignments of its income. (10) The United States District Court in No. 1067, in Equity, made a finding of fact that 21,535 shares of petitioner's capital stock standing in the names of various individuals, including Dale Sneed and L. D. Edgington, had been purchased with funds directly derived from the treasury of petitioner and that the named individuals held all of the shares of stock outstanding in their respective names without any beneficial ownership and for the sole use and benefit of the *417 stockholders and creditors of petitioner. The decree of the court impressed a trust upon such stock. It ordered the named individuals to deliver to the treasury of petitioner certificates for the 21,535 shares of stock. The United States District Court in No. 903, in Equity, by its decree, ordered that Earl Sneed should cause the nominees of Sneed Royalty to fully comply with the decree of the Court in No. 1067, in Equity, and to transfer all of the designated stock to petitioner. (11) The United States District Court in No. 903, in Equity, found, inter alia, that petitioner and Sneed Royalty had been operated as a single corporation; that their affairs had been commingled; that the officers and directors of the two companies had wrongfully caused the name of petitioner to be endorsed upon obligations of Sneed Royalty; that the proceeds of oil runs on petitioner's properties had been wrongfully applied to the payment of obligations of Sneed Royalty; that the officers of petitioner had wrongfully caused petitioner to execute mortgages on all of its separate properties, to secure indebtedness not its own, but of Sneed Royalty and affiliated corporations. The court found, also, *418 that petitioner and Earl Sneed had entered into an agreement and compromise under the terms of which Earl Sneed was to cancel and release all notes, claims, and demands against petitioner which were given in consideration for the transaction with Sneed Royalty on October 30, 1930, February 27, 1931, and April 18, 1931. The court also found that under the compromise agreement petitioner had agreed to discharge certain joint obligations of petitioner and Sneed Royalty, including demands of the Fourth National Bank of Tulsa, Mid-Continent Building Company, R. M. Hays & Co., Randolph, Haver, Shirk & Bridges, and to release all of its equity in the note given to L. L. Sugar, subject only to bank indebtedness against the note. The court directed petitioner to carry out the terms of the agreement which it had made with Earl Sneed in settlement of the suit. The court directed petitioner to convey back to Sneed Royalty all of the royalties and interests in properties which it had acquired in the transactions of October 30, 1930, February 27, 1931, and April 18, 1931, with the exception that petitioner was to retain a mineral interest of 50 royalty acres in a tract known as the "Todd Ranch." *419 (12) The effect of the compromise settlement and the decree in No. 903 was to set aside the transactions between petitioner and Sneed Royalty on the abovementioned dates. Under the compromise settlement Earl Sneed, trustee, relinquished all claim against petitioner upon the unpaid balance on the notes which petitioner had given to Sneed Royalty on April 18, 1931, in the amount of $97,273.87. Petitioner conveyed all of the interests in properties involved in the three transactions back to Earl Sneed's principal, but it did not recover any of its funds which had been paid to Sneed Royalty or for its use under the assignments given to secure the notes. The effect of the settlement of No. 1067, in Equity, was to set aside transfers of 21,535 shares of petitioner's stock to Sneed Royalty, which, apparently, were part of the block acquired on February 27, 1930. Petitioner finally received 21,553 3/4 shares of its stock under the settlement. Other items covered by the settlement are as follows: Petitioner was released from liability for accounts payable, per books, to Sneed Petroleum Corporation and Dale Sneed in the respective amounts of $639.34, and $495.10; notes payable in the amount *420 of $9,441.36; accrued interest payable, $1,252.91; accounts payable, $5,476.25. Petitioner retained interests in producing royalties and undeveloped royalties having a book value in the respective amounts of $192.78, and $1,517.82. Petitioner surrendered its claims under accounts receivable from Earl Sneed and Y Oil & Gas Co., in the respective amounts of $1,115.32 and $1,762.59. It surrendered all of its interest in a note receivable, the L. L. Sugar note, of a value of $20,943.20. It surrendered interests in a producing lease and a lease investment having a net value, per books, of $7,126.10, computed as follows: Producing lease
$16,000.00
Lease investment
8,853.85
$24,853.85
Less: Reserve for depletion
2,000.00
Reserve for depreciation
2,762.59
Purchase oil payment
1,113.89
Deferred oil payment
6,815.14
Lease obligation
5,036.13
(Magnolia)
17,727.75
Net
$ 7,126.10
Out of the proceeds of the L. L. Sugar note, petitioner paid, in compliance with the order of the court in No. 903, in Equity, the following items: the balance of a claim of the First National Bank & Trust Company of Tulsa on a note of petitioner (in an undisclosed amount); $10,346.23, to the *421 Fourth National Bank of Tulsa upon release of petitioner's notes held by the bank and mortgages upon its property and other claims of the bank; $3,000 to the Mid-Continent Building Company upon the joint account of petitioner and Sneed Royalty, in return for a full release over all claims upon petitioner; $970 to R. M. Hays Co. for the joint account of petitioner and Sneed Royalty, upon a full release of its claims against petitioner by reason of its execution of a note given by Y Oil & Gas Company to H. M. Hays Co.; $500 to Randolph, Haver, Shirk & Bridges of Tulsa, for the joint account of petitioner and Sneed Royalty, upon the delivery of full releases. The above payments were made in 1937. (13) George S. Seideman was petitioner's secretary from April 15, 1936, to August 4, 1937. During that period he performed services of value to petitioner. For his services there were incurred in 1936 and 1937 expenses in the respective amounts of $658.07 and $541.93. In 1937 he was paid $1,200 as compensation for his services, which was duly authorized by petitioner's directors. (14) During the period from October 26, 1935, to April 2, 1937, petitioner was without funds to meet the costs *422 of different law suits brought against it during that period and to meet the costs of audits, appraisals, legal fees, and court costs in connection with the proceedings instituted by petitioner to preserve its assets and to remove all liens against its property and income. During the above period, George C. Fuller, advanced $3,272.26 out of his own funds to petitioner to cover such expenses. At a special meeting of petitioner's directors held on December 17, 1937, George C. Fuller directed the attention of the meeting to his account for such advances to petitioner. He also made claim for compensation for his services for and on petitioner's behalf in the amount of $10,000. After his withdrawing from the meeting, the directors discussed petitioner's obligation to Fuller for the above items, and a resolution was adopted to repay Fuller out of petitioner's available cash. It also was resolved that petitioner should offer Fuller in lieu of compensation for his services 10,000 shares of petitioner's stock out of the shares of stock recovered under the decrees of the Federal Courts which were entered in 1937. On December 8, 1937, 10,000 shares of stock were transferred to Fuller in full *423 payment for his services to petitioner. On that date the fair market value of the stock did not exceed 35-cents a share. (15) An engineering firm, Cummins & Berger made an appraisal for petitioner of the Griffin-Davis lease and the charges for their services were $225.20. Petitioner desired to obtain a loan on this lease, and, for that purpose, engaged the above firm to make the appraisal. (16) John A. Young rendered services to petitioner as president from October 26, 1935, to November 11, 1936. Petitioner accrued expenses for his services in 1935 and 1936 in the amounts of $154 and $846, respectively. (16) (a) L. E. Cahill & Company rendered accounting services to petitioner in 1935, 1936, and 1937. In its income tax return for 1936 petitioner deducted $1,244.40 for accounting fees for the services of Cahill & Co. Respondent disallowed the deduction. (17) Sneed Royalty, being pressed by its banks and other creditors for payment on its debts in 1930 and 1931, entered into sham transactions with petitioner on October 30, 1930, February 27, 1931, and April 18, 1931. Under these transactions royalty interests were conveyed to petitioner to create large indebtedness in favor of Sneed *424 Royalty upon the basis of which it withdrew from petitioner's treasury substantial sums of money. Also, the officers of Sneed Royalty and petitioner, the same, caused petitioner's funds to be used for the payment of current expenses of Sneed Royalty. The same was done with respect to Y Oil & Gas Company, some of whose expenditures was paid by petitioner. Although new directors and officers, duly and lawfully elected, took over the management of petitioner in the latter part of 1935, the assignments of income which Sneed Royalty had caused petitioner to make to it in prior years were operative and until the assignments were set aside and cancelled under court order, in April of 1937, petitioner's income was still diverted for the use and benefit of Sneed Royalty and others throughout 1936 and part of 1937. At no time did petitioner receive any benefit, consideration, or reimbursement for the amounts of its income which was diverted to Sneed Royalty and others during 1935, 1936, and 1937. Petitioner sustained losses in 1935, 1936, and 1937, because of the misappropriation of its funds by its former officers in the following amounts: 1935
Paid to Fourth Nat'l Bank of indebt-
edness of Sneed Royalty
$18,461.48
Paid to or for use of Sneed Royalty
4,399.98
Total
$22,861.46
1936
Paid to Fourth Nat'l Bank upon in-
debtedness of Sneed Royalty
13,719.87
Salary to Earl Sneed from Sneed Roy-
alty
1,550.00
Deposited in the bank account of
Sneed Royalty
1,830.73
Expenses paid for Sneed Royalty
257.06
$17,357.66
1937
Paid to Fourth Nat'l Bank of indebt-
edness of Sneed Royalty
$ 2,418.04
*425 (18) For the year 1935 petitioner paid to the collector of Oklahoma City, income taxes and excess profits taxes in the respective amounts of $2,355.31 and $856.47. These amounts were paid on or about December 13, 1937. Thereafter, within the time allowed by law, petitioner filed a claim for refund of the taxes paid. (19) Petitioner's income tax return for the year 1936 was not filed until September 25, 1937. The return was signed by George C. Fuller, as president. It was prepared by L. E. Cahill of L. E. Cahill Co., auditors. The return was executed on September 24, 1937. Fuller attached an affidavit to the return which he executed on September 24, 1937, in which he set forth the reason why the return was filed after March 15, 1937, when it was due. He stated in the affidavit that the corporations had been involved in numerous suits in Federal District Courts in Oklahoma and Texas during the years 1935, 1936, and 1937, and that the United States District Court for the Northern District of Texas had issued a decree on April 2, 1937, in which the litigated differences in all pending cases were settled. A copy of the decree was attached to the return. The affidavit stated, further: *426 That during the pendency of the litigation mentioned in paragraph two hereof, the records and accounts of the Corporation were grossly neglected. That since April 2, 1937, this affiant together with the employees of the Corporation have been diligently engaged in marshalling the records, accounts, properties and revenue and expenses of the Corporation. The affiant further says, that for the reasons herein set forth, it was impossible to complete and file on Income and Excess Profits tax return for the Calendar year 1936, on or before March 15, 1937. That the delay in filing this return occasioned by the foregoing facts, was not wilful on the part of the Corporation or its officers, neither was there any intent to deprive the United States Government of any tax lawfully due it from the Corporation. (20) In its returns for 1935, 1936, and 1937, petitioner deducted total amounts, as follows, for legal and accounting fees, salaries, and other expenses, as ordinary expenses accrued in each year: 1935, $2,016.50; 1936, $14,055.63; 1937, $14,801.26. Respondent disallowed these deductions in each year in the entire amounts claimed. Opinion 1. Petitioner's first contention that it did *427 not receive any income in 1935 and 1936 and that its income for 1937 was overstated in the amount of $2,417.04, is rejected for the reason that income produced by property owned by petitioner cannot be attributed to another taxpayer. 2. Petitioner contends that it sustained losses in the taxable years, not compensated for by insurance or otherwise, because of misappropriation of its funds by its former officers who caused petitioner to make assignment of future income on April 18, 1931, without consideration. Respondent contends that the loss was sustained in 1937 when the settlement was made with Earl Sneed, trustee for Sneed Royalty Company, a bankrupt corporation. The transaction of April 18, 1931, under which petitioner purchased interests in unproductive properties at a grossly inflated value was not a bona fide transaction. Beyond any doubt, petitioner's former officers followed a procedure of causing petitioner to enter into transactions with Sneed Royalty, of which the above was one of a series, without receiving adequate consideration, and, by thus creating alleged indebtedness to Sneed Royalty, took most of petitioner's income. After considerable litigation Earl *428 Sneed, trustee, agreed that the transaction of April 18th should be set aside. That is the essence of the part of the settlement whereby petitioner returned various property interests and Sneed relinquished all claim on the unpaid balance of petitioner's notes. Since the transaction was not bona fide, ab initio, no debtor-creditor relation was created. See . The loss was not in the nature of a loss from a bad debt. The exact nature of the misappropriation of petitioner's income in the taxable years is of less importance than the character of the deduction. In our opinion the loss falls within the provisions of section 23(f) of the applicable revenue acts. It was in the nature of a loss from theft or embezzlement. See ; , dismissed, ; . The pending litigation in the taxable years does not militate against the conclusion that petitioner sustained losses *429 in the taxable years. During those years the financial position of Sneed Royalty and of petitioner's former officers was ascertained to be such that recovery of the misappropriated funds was very remote, according to the investigation made by petitioner's counsel. Sneed Royalty had been unable to pay its creditors for several years prior to 1936 and in that year it was adjudged a bankrupt. See . Respondent argues that the loss, if any, should be determined by regarding the settlement made in 1937 as creating the loss, and he cites , as an authority to support his view that petitioner failed to prove the amount of its loss. This argument proceeds upon an incorrect view of the effect of the settlement. It accomplished three general results; (1) the transaction of February 27, 1931, under which Sneed Royalty acquired some of petitioner's capital stock was set aside, in part; (2) the transactions of October 30, 1930, February 27, 1931, and April 18, 1931, were set aside; and (3) each party released the other from claims upon accounts receivable against *430 each other, and associates, and petitioner retained some property, and gave up other property. Under part (1) petitioner recovered capital stock for which no consideration had been paid. It did not recover the $17,900 advanced to Sneed Royalty in 1930 in that transaction; under part (2) petition re-conveyed substantialy all of the properties involved in the three transactions in 1930 and 1931, but recovered nothing; and under part (3) the benefits received by petitioner had a book value of less than what it gave up. The accounts receivable and note and properties surrendered had a value of $30,947.21, and the liabilities cancelled and properties retained had a value of $19,025.56. Petitioner has not claimed a loss in 1937 from the evident loss shown by part (3) of the settlement. As has been pointed out above, the transaction of April 18, 1931, considered alone, was of such nature that in 1935, 1936, and 1937 petitioner sustained losses. It is held that the amounts which were advanced to Sneed Royalty, directly and indirectly, in each taxable year, represented losses from the very time each advance was made and petitioner is entitled to deduct the amounts as losses in each year under *431 section 23(f). The evidence shows that the amounts advanced each year aggregated $22,861.46, in 1935; $17,357.66 in 1936; and $2,418.04 in 1937, and the losses sustained in each year were in the above amounts. . 3. In determining the deficiency for 1935, respondent made several adjustments in determining the amount of the gain which petitioner realized from the sale of its one-half interest in the Griffin-Davis lease. Petitioner reported gain in the amount of $8,410.89. Respondent determined that the gain was $14,429.76, adding to taxable income the amount of $6,018.87. Petitioner does not contest the correctness of the adjustments made by respondent, i.e., the amount of the gain, as adjusted. Accordingly, respondent's addition to income must stand. The substance of petitioner's contention under this issue is that it sustained losses in approximately the same amount of the gain from the sale, because it made advances to Y Oil & Gas Company in the amount of $14,351.89 out of the proceeds of a loan which petitioner obtained on April 6, 1935, shortly after the sale of the Griffin-Davis lease, and in the amount *432 of $2,254.45 out of its income for 1935. There is strong indication that all of such advances to Y Oil & Gas Company represented a misappropriation of petitioner's funds which resulted in petitioner's sustaining losses in 1935 in these amounts, just as losses were sustained as a result of the diversion of petitioner's funds to Sneed Royalty Co. However, petitioner did not introduce evidence to show what relation, if any, there was between the settlement of the claims against Sneed Royalty and the possibility of making recoveries from Y Oil & Gas Company. For example, the record does not show that Y Oil & Gas Company was insolvent in 1937 or before. It may be that petitioner could recover from Y Oil & Gas Company in some way, for all of the advances, and for any transactions with which it were not bona fide. For failure of proof petitioner's claim for any deduction in 1935 with respect to the Griffin-Davis lease or with respect to advances to Y Oil & Gas Company, is denied. 4. Petitioner's deductions in each taxable year for various expenses were disallowed. Each claim is considered separately. The question in each instance is whether the deduction is allowable as an ordinary *433 and necessary business expense in the particular year under section 23(a). It is pointed out, again, that petitioner keeps its books on the accrual basis. (a) Unallowable deductions. In its return for 1935 petitioner claimed a deduction for reporter's fees in the amount of $16.50. No evidence was introduced to support the claim. In its return for 1936 petitioner deducted $225.20 for appraisal fees of Cummins and Berger, and $1,244.40 for accounting service fees of L. E. Cahill & Co. There is no evidence to sustain these deductions. The services of Cummins & Berger are said to have been rendered in 1936 to enable petitioner to obtain a loan, and are said to have consisted of making an appraisal of the Griffin-Davis lease. Petitioner's claim for 1936 appears to be unsound, because the Griffin-Davis lease was sold in 1935, and could not have been mortgaged to secure a loan in 1936. The evidence relating to the charges of L. E. Cahill & Co. is incomplete. Fuller's testimony on this charge was incomplete, and Roquemore gave no testimony on the charge. The Cahill firm rendered services in all of the taxable years. There is question whether the expense which was incurred for the services *434 in 1936 is the amount now claimed, $1,244.40, or whether that amount is a total for expenses incurred in 1936 and other years. The evidence is insufficient to make a finding that the expense incurred in 1936 was in the amount of $1,224.40. In its return for 1935, petitioner deducted $2,000 for fees of the law firm of Randolph, Haver, Shirk & Bridges. They made a claim against petitioner for their appearance in the action No. 1067, in Equity. Petitioner, under new management, disavowed liability for their services which were unauthorized by the new management. No liability of petitioner for payment of any part of this charge was determined in 1935. The deduction in 1935 is not allowable. In its return for 1936 petitioner deducted $3,500 for fees of Max Chopnick and $65.18 for fees of Stewart Lynch. These attorneys rendered services in connection with a suit to sequester the property of Sneed Royalty. Because that action was to recover property, the expense falls within the class of capital expense and deductions as ordinary business expenses are not allowable. . In its return for 1937 petitioner deducted $79 for *435 an amount paid to John Alvin Young to reimburse him for expenditures made for petitioner. No evidence was offered to support this deduction. In its return for 1937 petitioner claimed a deduction in the amount of $250 for attorney fees for the services of Don T. Ingley. No proof was offered to support this claim. In its return for 1937 petitioner deducted $10,000 for compensation to Fuller for services and $3,272.26 reimbursement for expenses of petitioner which Fuller paid. On December 17, 1937, petitioner's directors adopted a resolution to offer Fuller 10,000 shares of its stock in lieu of compensation. He received the stock on or about December 18, 1937. Petitioner is entitled to deduct in 1937, as an ordinary expense, the fair market value of the stock. The evidence does not support a finding that the stock was worth $1 a share at the date of transfer to Fuller. It has been found on the basis of evidence relating to bid prices for the stock, that it had a value not in excess of 35 cents a share. It is held that petitioner is entitled to a deduction for $3,500. . Fuller testified that $3,272.26 was paid to *436 him to reimburse him for advances of money made by him on petitioner's behalf during 1937. Petitioner seeks a business expense deduction in 1937 in this amount. The item claimed is disallowed, chiefly for failure of proof. There is no evidence to show what expenditures were made by Fuller in petitioner's behalf. The proper treatment of the item would appear to be to treat it as a loan to petitioner, and, obviously, petitioner cannot receive a deduction for a repayment of a loan. Also, ordinarily petitioner, itself, would take deductions for its expenses, as such, for whatever it was that Fuller made cash advances. We cannot treat the repayment to Fuller as a "constructive expense", as petitioner seems to do. To do that might result in a double deduction. The expenses paid by Fuller might be included in other business expenses deducted by petitioner. Petitioner may have included items aggregating the claimed amount in other expenses for 1937. Lacking evidence to eliminate such questions, it cannot be held that the amount repaid to Fuller is deductible as a business expense. It is held that all of the above deductions are not allowable in the respective years, except $3,500 in 1937, *437 the value of the stock given to Fuller in lieu of compensation. (b) Allowable deductions. Petitioner is entitled to a deduction in 1936 for the expenses incurred for the services of Zweifel, Tuohy, and Creager in the amount of $520.85. Their employment was authorized by petitioner. Their services were to defend petitioner in a bankruptcy proceeding instituted by creditors. This was an ordinary business expense. . In its return for 1936 petitioner deducted $1,000 salary for John A. Young. He was president of petitioner from October 26, 1935 until November 11, 1936. In its brief petitioner contends that there was expense incurred for his services in 1935 in the amount of $160 and in 1936 in the amount of $840. Fuller testified that the sum of $1,000 was paid to Young for managerial services which he performed and that he did not receive any other salary or compensation; and that the payment was authorized by petitioner's directors. Payment of a claim of Young against petitioner was ratified retroactively on June 7, 1938. Young's services covered a period of thirteen months and his compensation was at the *438 rate of about $77 a month. It is held that the petitioner is entitled to deductions in 1935 and 1936 in the respective amounts of $154 and $846, as ordinary business expense. (There is testimony that Young advanced $500 for petitioner's expenses, but there is no evidence to show that any part of the above constituted reimbursement to Young for such advance. Fuller's testimony is to the contrary, that the $1,000 was paid for managerial services.) In its return for 1937 petitioner claimed a deduction for salary for its secretary, George S. Seideman in the amount of $1,200. Proof showed that part of the expense for his services were incurred in 1936. His services extended from April 15, 1936, to August 4, 1937, that is, he performed services for petitioner for about fifteen months. In its brief, petitioner claims, on the basis of the evidence adduced, that the expense incurred for Siedeman's salary was $658.07 in 1936, and $541.93 in 1937. It is held that the above amounts are ordinary and necessary expenses and are deductible in the respective years. (c) Under court order in No. 903, in Equity, petitioner was directed to set aside the proceeds of the L. L. Sugar note to pay various *439 claims of creditors of both petitioner and Sneed Royalty. Part of the proceeds was ordered to be paid to the firm of Randolph, Haver, Shirk, and Bridges, in the amount of $500 for the joint account of petitioner and Sneed Royalty. On its books petitioner treated the equity in the Sugar note as one of its assets surrendered in the settlement entered into with Earl Sneed in the amount of $20,943.30. Petitioner applied all of the proceeds of the note as it was directed by the court. It has not claimed the other payments so made as business expenses incurred in 1937 and we find no reason for according such treatment to the above payment of $500. Neither has petitioner claimed a loss in 1937 as a result of its surrender of various special assets under the settlement. There might be an argument that the disbursement of the above $500 entered into losses sustained under the settlement. But the pleadings do not present this question. It is held that petitioner is not entitled to deduct this $500 in 1937 as a business expense. (d) In its return for 1936 petitioner deducted $7,500 for legal fees of the firm of Coakley & McDermott. Petitioner now claims that it incurred expenses for these services *440 as follows: $750 in 1935; $3,250 in 1936; and $3,500 in 1937. Respondent contends that all of the services of this firm were devoted to recovering property and, accordingly, the expense incurred is a capital expense, and is not deductible. Respondent cites , aff'd on this point, . The services of this firm were duly authorized. Much of their work was in petitioner's defense in suits involving efforts to place petitioner in involuntary bankruptcy, to restrain the holding of an annual meeting of stockholders, and to resist claims of creditors. The suit instituted against petitioner by Earl Sneed, trust, No. 903, in Equity, was an action on a note of petition and to foreclose on collateral given to secure the note. Petitioner's cross-bill in that suit was primarily to recover petitioner's income. In all of the above litigation the issues were directly the result of the conduct of petitioner's business. The cost of defending an action is an ordinary business expense. :; *441 . The problem under this question is whether the object of some of the litigation in which Coakley & McDermott served petitioner was for the purpose of acquiring property so as to require an apportionment of the fees in question between business expense and capital expense. (Not all of the services of this law firm were for litigation. About onethird of the services was for general counsel work, according to McDermott's testimony.) Also, the above problem is concerned only with the services involved in defending petitioner in the two suits in Equity brought by Fuller, in one case, and Sneed, in the other. (All of the other litigation was of such nature that the legal expenses were clearly business expenses.) Both suits involved several claims, because the relief sought was diverse in order to make the pleadings embrace every possible issue. But, primarily, the object of Fuller's suit, in which petitioner was a defendant, and the object of the cross-bill filed by petitioner in Sneed's suit, was to obtain an accounting from the former management so as to recover petitioner's funds and set aside invalid, inter-company *442 transactions. Also, Fuller in his suit sought to remove the former officers from the management and control of petitioner. And, the ultimate objects were to prevent further impairment of petitioner's business by preventing the continued diversion of its income to the uses of Sneed Royalty. In short, the primary motive throughout was to set aside various transactions to prevent the loss of earnings. When the two suits were settled in 1937, the invalid inter-company transactions were set aside, and petitioner's income was released from assignment. The setting aside of various transactions involved releasing petitioner's property from mortgage liens, but that was not the primary object of the litigation. Rather, that result was secondary to preventing the loss of petitioner's earnings. With respect to eliminating the Sneeds and their nominees from control of petitioner, stock ownership was a factor. In No. 1067, the court held that some of petitioner's stock had been acquired without consideration, and that transaction was set aside. Upon due consideration, it is concluded, first, that all of the legal services of Coakley & McDermott were of the same general character, i.e., for the *443 preservation of petitioner's income, and, second, that the expenses for the legal fees are deductible in each year as ordinary business expenses, because all of the litigation grew out of business transactions of petitioner. Deductions are allowed in each year in the respective amounts of $750, $3,250, and $3,500. (5) Under the holdings which have been made with respect to the year 1936, it appears that allowable deductions will eliminate the deficiency, and there will be no amount to which the penalty will attach. However, we determine the question in the event a small deficiency for 1936 may be found. In our opinion petitioner has demonstrated that the late filing of the return was not due to willful neglect, but was due to reasonable cause, and the penalty under section 291 of the Revenue Act of 1936 should not be added. . Decision will be entered under Rule 50. Footnotes
1. Testimony was given that the running account was in balance on December 31, 1930, but this appears to be incorrect, because of the balance due Sneed Royalty on February 27, 1931, in the amount of $19,673.22.↩